Appellant=s Motion for Rehearing Granted in Part and Denied in Part;
Affirmed as Modified in Part and Reversed and Remanded in Part; Opinion of
August 26, 2008, Withdrawn and Substitute Opinion on Rehearing filed June 4,
2009








 

Appellant=s Motion for Rehearing Granted in Part and Denied in
Part; Affirmed as Modified in Part
and Reversed and Remanded in Part; Opinion of August 26, 2008, Withdrawn and
Substitute Opinion on Rehearing filed June 4, 2009.

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-06-00651-CV

____________

 

TEXAS MUTUAL INSURANCE COMPANY, Appellant/Cross-Appellee

 

V.

 

P. LANCE MORRIS, Appellee/Cross-Appellant

 



 

On Appeal from the 11th
District Court

Harris County, Texas

Trial Court Cause No. 2004-53230

 



 

S U B S T I T U T E   O P I N I O N   O N   R E H E A R I N G  

The court issued a unanimous opinion in this case on August
26, 2008.  Appellant Texas Mutual Insurance Company moved for rehearing.  After
receiving a response from appellee P. Lance Morris, the court grants the motion
for rehearing in part, withdraws the earlier opinion, vacates the earlier
judgment, and issues this substitute opinion and new judgment in their place.








I.  Introduction

A workers= compensation carrier appeals from a final
judgment in favor of a workers= compensation claimant.  In six issues,
the carrier contends that (1) the evidence is legally insufficient to sustain
the jury=s finding that the
carrier engaged in unfair or deceptive acts or practices in violation of the
Texas Insurance Code, (2) the evidence is legally insufficient to sustain the
jury=s finding that the
carrier did so knowingly, (3) the evidence is legally insufficient to support
the award of damages for loss of credit reputation, (4) the evidence is legally
insufficient to support the award of mental-anguish damages, (5) the trial
court erred in submitting broad-form liability questions containing both valid
and invalid theories of liability, and (6) the judgment cannot be sustained on
the alternative claim of breach of the duty of good faith and fair dealing
because no such claim is recognized in the context of a workers= compensation
claim.  In a cross-appeal, the claimant requests that this court modify the
trial court=s judgment to increase the award of additional damages
for the carrier=s knowing violation of the Texas Insurance
Code.  








We conclude that the evidence is legally sufficient to
support the jury=s findings that the carrier engaged in
unfair or deceptive acts or practices in violation of the Texas Insurance Code
and that it did so knowingly.  We also conclude that legally sufficient
evidence supports the award of mental-anguish damages, and that no Casteel[1]
problem requires reversal.  However, we conclude that no evidence supports the
award for loss of credit reputation.  We further conclude that the claimant=s cross-appeal
lacks merit.  We therefore modify the judgment to delete that portion awarding
the claimant damages for loss of credit reputation and to reduce the additional
damages accordingly.  Further, because we are reducing the actual damages
awarded to the claimant, we also reverse the portion of the judgment awarding
attorney=s fees, and remand
this case for retrial of that issue and for the recalculation of pre-judgment
and post-judgment interest.  We affirm the remainder of the judgment. 

II.   Factual and Procedural Background

Appellee/cross-appellant P. Lance Morris brought this suit
against appellant/cross-appellee Texas Mutual Insurance Company, alleging that
the company acted in bad faith and violated the Texas Insurance Code because it
failed to properly investigate Morris=s claim for
workers= compensation
benefits, and that it delayed paying workers= compensation
benefits due him.  Morris alleged that, on June 12, 2000, while working for the
Justin Volunteer Fire Department he received an on-the-job injury to his spine
(the A2000 Injury@).  Then, in March
2003, Morris required emergency treatment for his back injury.  According to
Morris, Texas Mutual initially promised to pay for surgery on his back, but
only days after the surgery, the company reneged on this promise.  Morris
alleged that the requested treatment for his injury was reasonable and
necessary, but Texas Mutual delayed and denied payment for the previously
pre-authorized medical treatment, with significant adverse consequences to
him.  Morris also alleged that the Texas Workers= Compensation
Commission (hereinafter the ACommission@)[2] 
adjudicated that Texas Mutual wrongfully denied his claim for benefits.  Morris
claimed that Texas Mutual violated the Texas Insurance Code, breached its
common-law duty of good faith and fair dealing, and violated the Deceptive
Trade Practices Act (ADTPA@).[3] 









Texas Mutual answered the suit and later amended its answer
to add a counterclaim for fraud.  In the counterclaim, Texas Mutual alleged
that Morris strained or sprained his back in 1998, two years before the 2000
Injury, and that he falsely represented to the Commission that he did not have
a pre-existing back injury.  Texas Mutual claimed that Morris knew this
representation was false when he made it, and that Texas Mutual relied upon it
and was injured by having to pay for benefits that would not have been due if
the extent of Morris=s back problems had been disclosed fully.

In the March 2006 trial, the jury returned a 10-2 verdict
in Morris=s favor on his claims for common-law bad faith and
statutory violations.  The jury awarded Morris $50,000 for past mental anguish;
$25,000 for past damage to his credit reputation; $50,000 for future damage to
his credit reputation; and $120,000 for attorney=s fees.  The jury
also awarded Morris $500,000 in additional damages because it found that Texas
Mutual knowingly violated the Texas Insurance Code.  The jury declined to find
that Texas Mutual acted with malice or that Morris defrauded Texas Mutual.  On
May 18, 2006, the trial court signed a final judgment for Morris, awarding the
amounts found by the jury, except for the $500,000 in additional damages, which
the trial court reduced to $250,000.  On appeal, Texas Mutual raises six
issues, and Morris raises one issue in his cross-appeal.

III.  Issues Presented by the Carrier

In its first four issues, Texas Mutual contends the
evidence is legally insufficient to support: 

$                  
the jury=s finding that Texas Mutual engaged
in unfair or deceptive acts or practices in violation of the Texas Insurance
Code, 

$                  
the jury=s finding that Texas Mutual
violated the Texas Insurance Code knowingly, and

$                  
the
jury=s damage awards
for mental anguish and lost credit reputation.  








In its
fifth issue, Texas Mutual contends that the trial court erroneously instructed
the jury on both valid and invalid theories of liability.  In its sixth issue,
Texas Mutual contends that no cognizable claim exists for breach of the duty of
good faith and fair dealing against a workers= compensation
carrier, or alternatively, any such claim should be abolished.

A.      Legal Sufficiency of Evidence Supporting Jury=s Finding that the
Carrier Engaged in Unfair or Deceptive Acts or Practices in Violation of the
Texas Insurance Code

In its first issue, Texas Mutual contends that no evidence
supports the jury=s finding that Texas Mutual engaged in
unfair or deceptive acts or practices in violation of the Texas Insurance Code
because no evidence shows that it misrepresented the policy or failed to
explain the basis for the dispute, and no evidence shows that it knew or should
have known that coverage was reasonably clear.  Texas Mutual also contends that
the evidence conclusively shows that it had a reasonable basis to dispute
Morris=s claim.  When
reviewing the legal sufficiency of the evidence, we consider the evidence in
the light most favorable to the challenged finding and indulge every reasonable
inference that would support it.  City of Keller v. Wilson, 168 S.W.3d
802, 823 (Tex. 2005).  We must credit favorable evidence if reasonable jurors
could and disregard contrary evidence unless reasonable jurors could not. See
id. at 827.  We must determine whether the evidence at trial would enable
reasonable and fair-minded people to find the facts at issue.  See id. 
We cannot substitute our judgment for that of the jury, so long as the evidence
falls within the zone of reasonable disagreement.  See id.  at 822.  The jury is the only judge of witness
credibility and the weight to give to testimony.  See id. at 819.

1.       Jury=s Liability Finding Regarding the
Texas Insurance Code

    








The judgment against Texas Mutual is predicated on the jury=s affirmative
answer to Question 2.  In that question, the jury was asked whether Texas
Mutual engaged in any one or more of eight unfair or deceptive acts or
practices under Texas Insurance Code sections 541.060 and 541.061.[4] 
In propounding that question the court instructed the jury to consider the
following ways in which an insurer could engage in an unfair or deceptive act:

Making any misrepresentation of an insurance policy by:

a.       making an untrue statement of fact;[5]
or 

b.       failing to state a material fact that is
necessary to make other statements made not misleading, considering the
circumstances under which the statements were made;[6]
or 

c.       making any statement in such manner as to
mislead a reasonably prudent person to a false conclusion of a material fact;[7]
or 

d.       failing to disclose any matter required by
law to be disclosed;[8]
or

Engaging in any of the following unfair settlement practices with
respect to a claim by an insured or beneficiary:

a.       misrepresenting to a claimant a material
fact or policy provision relating to coverage at issue;[9]
or

b.       failing to attempt in good faith to
effectuate a prompt, fair, and equitable settlement of a claim with respect to
which the insurer=s liability has become reasonably
clear;[10]
or 

c.       failing to provide promptly to a
policyholder a reasonable explanation of the basis in the policy, in relation
to the facts or applicable law, for the insurer=s denial of a claim or for the offer of a compromise
settlement of a claim;[11]
or 








d.       refusing
to pay a claim without conducting a reasonable investigation with respect to
the claim.[12]

On appeal, Texas Mutual contends
that no evidence supports any of the acts listed.  

As a preliminary
matter, we first address the proper legal standard against which to measure the
legal sufficiency of the evidence.  Texas Mutual argues that, under Texas law,
(1) proof that a workers= compensation carrier refused to pay a
claim without conducting a reasonable investigation is not sufficient to
support liability against the carrier for violating the Insurance Code, and (2)
the claimant also must prove a failure by the carrier to attempt in good faith to
effectuate a prompt, fair, and equitable settlement of a claim with respect to
which the carrier=s liability has become reasonably clear.[13] 
For ease of reference, we refer to the first element as Ano reasonable
investigation@ and the second element as Areasonably clear
liability.@[14]  Morris, on the
other hand, asserts that liability may be affirmed based only upon legally
sufficient evidence that Texas Mutual failed to conduct a reasonable
investigation.[15] 









For the purposes of our analysis, we presume, without deciding,
that Texas Mutual=s characterization of Texas law is
correct.  Nonetheless, Question 2 did not charge the jury on this law; rather,
it allowed the jury to find an Insurance Code violation based only on a finding
of no reasonable investigation.[16] 
No party objected to Question 2=s failure to charge the jury on what Texas
Mutual argues on appeal is the correct legal standard, and no party requested
that the jury be charged under this legal standard.[17] 
Therefore, this court reviews the sufficiency of the evidence under the charge
submitted to the jury (allowing liability to be based on a finding of either no
reasonable investigation or reasonably clear liability), even if the charge did
not correctly state Texas law.  See Osterberg v. Peca, 12 S.W.3d 31, 55
(Tex. 2000) (holding that court could not review the sufficiency of the
evidence based on a particular legal standard because that standard was not
submitted to the jury and no party objected to the charge on this ground or
requested that the jury be charged using this standard); Hirschfeld Steel Co. v. Kellogg
Brown & Root, Inc., 201 S.W.3d 272, 283B86 (Tex. App.CHouston [14th Dist.] 2006, no. pet.)
(reviewing sufficiency of evidence based on unobjected-to jury instruction and
rejecting various arguments based on different legal standards).  Accordingly,
if there is legally sufficient evidence of either no reasonable investigation or
reasonably clear liability, there is legally sufficient evidence to support the jury=s answer to Question 2. 








2.       Evidence of ANo Reasonable Investigation@ and AReasonably Clear Liability.@

Texas Mutual asserts that the evidence is legally
insufficient to support either a finding of Ano reasonable
investigation@ or a finding of Areasonably clear
liability.@  Texas Mutual contends that its records showed that
Morris had a minor injury that resolved in 2000 and a new, and more severe,
injury in 2003, caused by an unrelated incident.  Therefore, Texas Mutual
asserts, the evidence conclusively shows that the company had a reasonable
basis to deny or delay paying Morris=s workers= compensation
claim based on the 2000 Injury.  Texas Mutual claims that it had a reasonable
basis to question whether the back strain Morris sustained in connection with
the 2000 Injury was a cause of his need for back surgery in April 2003. 
According to Texas Mutual, its records showed that Morris suffered only a minor
injury for which he received one month of chiropractic treatment; he returned
to work without restrictions after missing only one shift.  In addition, Texas
Mutual claims, the medical records available from Morris=s surgeon in April
2003 reflected that Morris=s injury requiring surgery occurred when
he slipped or fell off a fire truck, not while lifting a patient out of a ditch
as occurred on June 12, 2000.  Thus, because Texas Mutual=s records
indicated a minor injury while lifting a patient out of a ditch, that had fully
resolved in 2000, and a Anew and more severe injury in 2003
cause[d] by a different incident,@ Texas Mutual
believed it had grounds to dispute whether Morris=s surgery was
connected with the 2000 Injury.  

The question before this court is whether legally
sufficient evidence exists to show Ano reasonable
investigation@ or to show Areasonably clear
liability.@ The following evidence presented to the jury supports
a finding as to both items.








The 2000 Injury and the Surgery

On June 12, 2000, while working for the Justin Volunteer
Fire Department, Morris hurt his back when he lifted a victim of a
motor-vehicle accident out of a ditch.  The fire department reported the injury
to its workers= compensation carrier, Texas Mutual, which accepted
the claim.[18] 
Morris visited a chiropractor, Dr. Waldrop, the day he was injured.  Dr.
Waldrop=s initial medical
report to the Commission noted that Morris was injured when he Alifted a patient
and felt sharp shooting pain in the lumbar portion of his spine.@   The doctor=s clinical
assessment indicated that Morris had Apalpable muscle
spasms at the L-4 B L-5 level of his spine.@  Morris received
several chiropractic treatments from Dr. Waldrop over the next two weeks. 
After that, Morris had periodic appointments with Dr. Waldrop over the next
two-and-a-half years.  Morris missed only a brief period of work as a result of
the 2000 Injury.

In February 2003, Morris married and moved from Justin to
Sugar Land.  After the move, Morris began seeing another chiropractor, Dr.
King.  At some point, Morris began experiencing increasing pain in his back,
and on March 23, 2003, Morris went to the emergency room at Methodist Hospital
in Sugar Land.  The hospital referred Morris to a neurosurgeon, Dr. Charles
Neblett, who diagnosed Morris with a herniated disc.[19] 
Dr. Neblett requested preauthorization from Texas Mutual to perform an AL4-5 L5-S1 lumbar
laminectomy.@  Texas Mutual granted the request for
pre-authorization on April 1, 2003.  Surgery was performed the next day.








The Initial Inadequate Investigation 

On April 3, 2003, Texas Mutual transferred Morris=s file to a new
adjuster, Joy Rodgers.  Four days later Rodgers took her first documented
action on the file.  On that day, April 7, 2003, Rodgers reviewed the file and
called Bill Mitchell, the fire chief of the Justin Volunteer Fire Department,
to find out about Morris=s 2000 Injury.  According to Rodgers=s claim diary,
Mitchell told her that Morris returned Aat full duty
without any problems.@   On that same day, April 7, Rodgers
prepared and filed a ANotice of Refused or Disputed Claim,@[20] giving notice
that Texas Mutual disputed the claim. 

By deposition, Rodgers testified that she knew she had a
duty to investigate the claim, which included a procedure known as a Athree-point
contact.@  As its name
suggests, a Athree-point contact@ entails
contacting three sources of information:  (1) the injured worker, (2) the
employer, and (3) the medical provider.  Rodgers admitted that she did not
complete the three-point contact before disputing the claim.  








Before Rodgers communicated Texas Mutual=s denial of the
claim, neither she nor anyone else spoke to Morris=s surgeon, Dr.
Neblett, even though the documentation submitted for preauthorization by Dr.
Neblett indicated that the need for surgery arose from the 2000 Injury.  Nor
did Rodgers talk to any other treating doctor.  Rosalind Thompson, a Texas
Mutual claims supervisor, acknowledged that before Texas Mutual denied the
claim it did not ask a doctor whether the 2000 Injury was a producing cause of
Morris=s surgery, even
though Texas Mutual knew the names of the two doctors who had treated Morris
from the time of the 2000 Injury to days before his surgery.  And, although
Rodgers, in her claims diary, noted that she called the surgeon, Dr. Neblett,
she did not speak with the doctor but instead spoke to administrative personnel
in his office to let them know that Texas Mutual was disputing the claim. 
Morris=s expert testified
that Dr. Neblett was the best person for Rodgers to speak with in conducting an
investigation because he saw and physically examined Morris.

Notably, Rodgers did not even speak with Morris before
denying his claim.  Initially, MitchellCthe only person
with whom Rodgers did speak C did not recall speaking to Rodgers, and
Mitchell testified that he would not have told her Morris returned at full duty
with no problems.[21] 
Rodgers apparently did not inquire into any of the details of Morris=s injury.  At
best, the evidence shows that she made only a cursory inquiry with Mitchell
into Morris=s status when he returned to duty.  

One fact that seemed to play heavily in Rodgers=s decision to
dispute coverage was that the description Morris gave for how he injured
himself in 2000 differed from the cause reflected in Texas Mutual=s records.  Even
with this variation, the date Morris gave for his injury C June 12, 2000 C was correct. 
Before disputing the claim, Rodgers failed to ask Morris about this
discrepancy.  Although a field investigator was assigned to speak with Morris
and apparently did speak with him a week or so after the surgery, the
investigator apparently did not ask Morris about the discrepancy and did not
ask him for medical records.








Frank Weedon, Morris=s insurance
expert, testified that Rodgers=s investigation of the claim was not
reasonable because she failed to conduct a Athree point
contact.@  Weedon explained
that Rodgers did not speak to either Morris or his treating doctors, and, at
most, had only a brief discussion with Mitchell before filing the dispute on
April 7, 2003, the same day she first reviewed the file.  Although Rodgers
testified that she felt she did not need to speak with a doctor to learn more
about Morris=s physical condition before she disputed the claim,
she knew about the three-point-contact principle and agreed that use of this
method would have been the proper way to conduct an investigation.  Reasonable
jurors could have chosen not to believe Rodgers=s claim that she
did not need to speak with a doctor in this particular case. 

                          Other
Actions by the Carrier Regarding the Claim

Texas Mutual continued to dispute coverage for the next
several months.  Texas Mutual asserted it did not receive an authorization from
Morris to obtain medical records; however, Morris faxed an authorization form
to Texas Mutual no later than mid-April 2003.  The form was signed by his wife
because he was back in the hospital at the time.  Texas Mutual stated that it
would not have been able to obtain any records with this form because Morris
himself did not sign it, but it also appears that Texas Mutual did not attempt
to obtain any records with the form.  In addition, Morris said that no one at
Texas Mutual ever asked him for another authorization and never requested his
medical records.  








Eventually, Morris retained attorneys to represent him in
the dispute with Texas Mutual.  On August 29, 2003, Morris=s attorneys faxed
to Texas Mutual some of Morris=s medical records, including a page of
treatment notes from Dr. Waldrop, the chiropractor Morris saw after the 2000
Injury.  Documented in this page of treatment notes was Dr. Waldrop=s treatment of
Morris between November 2001 and January 2003.  Morris=s attorneys
specifically sent this page because Texas Mutual said it had no record of
treatments for Morris between 2001 and 2003.  The notes indicate, among other
things, that Morris had AL5/S1 n. root disc radiculopathy.@[22]  The Texas Mutual
employee who was responsible for organizing the medical records testified that
the company failed to forward this important page because the document was
wrongly coded.  She explained that this page was behind another page that was
an approval for a new physician, Dr. King, who saw Morris from February to
April, just before the surgery.  Seeing the approval letter, she coded the
documents following it as relating to the approval letter, apparently without
checking to ensure that this coding determination was accurate.  Another Texas
Mutual employee testified that no other medical documents were wrongly coded.

In November 2003, Morris and Texas Mutual participated in a
benefit-review conference at the Commission=s offices, but the
dispute was not resolved at that time.  Texas Mutual requested that Morris
submit to a medical examination by a doctor of its choice, and Morris agreed. 
Texas Mutual chose Dr. Stephen DeYoung.  On January 7, 2004, Texas Mutual sent
Dr. DeYoung a letter asking him to determine, among other things, whether the
lumbar herniations that were surgically treated in April 2003, were causally
related to the Alumbar strain@ of the 2000
Injury.  Texas Mutual represented that it had attached Aall of the medical
records currently available@ to it for Dr. DeYoung=s review. 
However, Texas Mutual did not forward any medical records from Dr. Waldrop,
stating that it had Ano documentation of medical treatment from
the DOI,[23]
to 02/19/03@Ceven though Texas Mutual had received the
page of treatment notes from 2001B2003.  In
its summary of Morris=s medical condition, Texas Mutual also
pointed out that Dr. King=s medical records reflected that the Amechanism of
injury@ was different
than that reported by the employer.  The first report of injury, on June 12,
2000, indicated that Morris strained his back after carrying a patient out of a
ditch, while Dr. King reported that he Afell off the fire
truck after slipping off tread steps.@  No one from
Texas Mutual ever asked Morris about this discrepancy. 

Examination by Carrier=s Chosen Doctor








On January 22, 2004, Dr. DeYoung examined Morris, who
provided both an oral and written medical history.  Morris told Dr. DeYoung
that he was injured on June 12, 2000, when carrying a patient on a backboard
out of a ditch to an ambulance, and that he had been receiving chiropractic
treatment from Dr. Waldrop until he moved to Sugar Land and began seeing Dr.
King in 2003.  Morris did not tell Dr. DeYoung about an earlier injury he
sustained in 1998, for which he received chiropractic treatments from Dr. Waldrop. 
At trial, Morris explained that he recovered fully from that incident and did
not consider it an injury, and, for that reason, he did not tell Dr. DeYoung
about it.  Morris also explained that he did not fall off a truck; he began to
fall and caught himself.  The act of catching himself caused the injury.

Dr. DeYoung wrote to Texas Mutual explaining that, given
the lack of medical records, he could not determine whether Morris aggravated
and accelerated his pre-existing lumbar disc degeneration and spondylosis,
which ultimately led to a herniation, or whether the herniation was secondary
to a disease of life.  Therefore, Dr. DeYoung opined that (1) if Morris had no
history of lower back difficulty prior to the 2000 Injury, and (2) if the
medical records support ongoing difficulty with the lower back from the date of
the 2000 Injury until Morris sustained the herniations in April 2003, he would
give Morris Athe benefit of the doubt and causally relate the disc
herniations to the lumbar strain of June 2000 as a result of aggravation and
acceleration of the pre-existing lumbar disc degeneration and spondylosis.@  Even though it
had medical records from the very years Dr. DeYoung mentioned, and even though
it had no records of an earlier injury, Texas Mutual continued to dispute the
claim.  Texas Mutual advised Morris that he would have to schedule a second
benefit-review conference to resolve the dispute.

  The Commission=s Benefit Review
Officer=s Ruling that Claimant=s Herniated Disc

                                        was Related to the
2000 Injury








A second benefit-review conference was held in June 2004,
more than a year after the surgery.  Again, the parties were unable to reach an
agreement, at least in part because Texas Mutual claimed it still had no
medical records reflecting continuing chiropractic treatments by Dr. Waldrop
for the 2000 Injury.  According to documentation from the Commission, Texas
Mutual=s position was
that Dr. DeYoung=s ability to determine causation was
hampered because the records were not available; Morris countered that he had
provided the records to Texas Mutual several times and had no control over
whether Texas Mutual forwarded them to Dr. DeYoung.[24] 
The benefit-review officer noted the gap in the medical records, but still
recommended the payment of benefits to Morris.[25] 
The review officer found the following:

A review of the
initial medical records from Dr. Waldrop noted the claimant=s symptoms, which
are consistent with the current diagnoses at L4-L5 and at L5-S1.  There are
medical records from other doctors in the file supporting a causal connection
between the findings on the diagnostic studies performed in 2003 and the
original injury.

(emphasis
added).  In reaching her conclusion, the benefit-review officer also found significant
the reference to radiculopathy in Dr. Waldrop=s notes of
November 21, 2001.  Texas Mutual declined to accept this recommendation,
and a benefit contested-case hearing was scheduled for July 2004.

                                         The Contested
Case Hearing








On July 1, 2004, in preparation for the contested-case
hearing, Texas Mutual forwarded to Dr. DeYoung medical records showing Morris=s Ainitial treatment@ with Dr. Waldrop,
and asked him to review the records and determine whether the April 2003
herniations were the result of a pre-existing condition or the 2000 Injury. 
Once again, Texas Mutual did not include the page of Dr. Waldrop=s records showing
that Morris had a number of chiropractic treatments between 2001 and 2003.  In
response, Dr. DeYoung reported that the records were Alimited@ and Adid not provide
any detail with respect to his history and examination.@  He also noted
that the records showed that Morris Awas last treated
by Dr. Waldrop in January 2001.@  This time, Dr. DeYoung opined that if
Morris did not receive any medical treatment for his lower back between January
2001 and February 2003 (when Morris saw Dr. King), he would attribute Morris=s condition Amore to a disease
of life than the work related injury.@ 

At the contested-case hearing, the Commission received
sworn testimony and evidence, and ultimately determined that A[t]he herniations
in [Morris=s] lumbar spine at levels L4-5 and L5-S1 were caused
and/or aggravated by, and naturally resulted from, his June 12, 2000 injury.@  Consistent with
the benefit-review officer=s recommendation, the Commission noted that
the medical evidence showed that Morris was complaining of an L5-S1
radiculopathy in November 2001, when he was receiving treatment from Dr.
Waldrop.  The Commission=s decision reflected that it was based
largely upon Morris=s testimony that he had no prior history
of back problems, and that he had required continuous treatment since the 2000
Injury C testimony that
satisfied the conditions under which Dr. DeYoung would find causation.[26] 
The Commission ordered Texas Mutual to pay medical benefits to Morris.  Texas
Mutual did not appeal this decision.








                Carrier=s Actions
Following Discovery of the 1998 Back Strain

After Morris filed suit against Texas Mutual and discovery
ensued, Texas Mutual learned that Morris strained or sprained his back in 1998,
when he slipped on or fell from the running board of a fire truck two years
before the 2000 Injury.  At that time, Morris missed two weeks of work and
underwent numerous chiropractic treatments.  Texas Mutual counterclaimed for
fraud, alleging that Morris fraudulently testified before the Commission that
he had no back injuries before the 2000 Injury. 

When Dr. DeYoung C the doctor who in
his first opinion had given Morris the benefit of the doubt in determining that
the 2000 Injury was causally related to the 2003 herniated disc C was later
deposed, he was asked whether the medical information concerning Morris=s 1998 back injury
and the treatments by Dr. Waldrop after the 2000 Injury changed his earlier
opinion.  Dr. DeYoung testified that, based on this information, he would
conclude that the 2000 Injury was not causally related to the herniated disc
requiring surgery in April 2003.  However, on cross-examination, Dr. DeYoung
admitted that Dr. Waldrop=s omitted treatment notes did reflect Aperiodic@ treatments
between 2000 and 2003, the specific time frame Dr. DeYoung had indicated to
Texas Mutual was most important to his evaluation.  He also acknowledged that
Morris=s medical records
reflected that Morris had between 25 and 30 treatments between June 2000 and
March 2003, contrary to Texas Mutual=s representation
that it had no documentation of treatment in that time frame.  Dr. DeYoung also
admitted that, while Morris had received chiropractic treatments before the
2000 Injury, he had not received treatment from a medical doctor, and he was
able to return to work after the 1998 incident.








Texas Mutual also contends that Dr. DeYoung was not misled
about Morris=s treatment with Dr. Waldrop because Morris gave him
an oral medical history that included Dr. Waldrop=s treatment of him
between the time of the 2000 Injury and January 1, 2003.  However, Dr. DeYoung
testified that if an insurance company wrongly told him it did not have
documentation of treatment when the company did have it, he would be Aconcerned that I
was being a little misled if I didn=t have all of the
correct information.@  He also testified that he was most
interested in records from that time frame because Ait would be
probably the most important time period for making an accurate assessment of
[Morris=s] medical problem@ and he relied on
Texas Mutual to give him all the medical records it had.

Additionally, Morris=s expert testified
that Texas Mutual could refuse the claim only if another event was the sole
cause of the herniated disc.  Thus, according to Morris=s expert, even if
the 2000 Injury were a Aone percent@ cause of the
herniated disc because it aggravated an earlier condition, it would be
compensable and causally related.  Texas Mutual=s own expert
agreed that Texas Mutual could use the 1998 injury as a justification for not
paying for the surgery only if the 1998 injury was the sole cause of the
herniated disc.  But, Dr. DeYoung did not testify that the 1998 injury was the
sole cause of the herniated disc; in fact, no doctor at trial testified that
the 1998 injury was the sole cause of the herniated disc.  And, as Dr. DeYoung
acknowledged, the nature of Morris=s injury in 2000
was one that may aggravate a pre-existing back problem and lead to a disc
herniation. 








Thus,
the jury had before it proof that the claims adjuster (Rodgers) denied or
disputed the claim the first day she looked at the file and that, in deciding
to deny or dispute coverage, she ignored accepted methods of investigating a
claim.  One of the adjuster=s proffered reasons for disputing coverage was that the
description of the original injury did not match the injury shown on file, but
the adjuster never asked Morris about this discrepancy.  The jury had proof
that Morris=s attorneys provided Texas Mutual the relevant medical records, and that
Morris signed a release so that Texas Mutual could obtain any other relevant
records, but Texas Mutual failed to forward a crucial page from these records
to its medical expert and failed to do so on more than one occasion.  Texas
Mutual=s representatives said that the
company did not forward the page of medical notes because the document was
wrongly coded, but no other page of medical notes was wrongly coded.  Further,
although Texas Mutual contended that either an undisclosed earlier injury or a
new injury in 2003 caused Morris=s herniated disc, Texas Mutual
offered no evidence that it had any reason to believe that any new or
pre-existing injury was the sole cause of Morris=s herniation that would have
precluded coverage.[27]  Finally, the jury
heard Dr. DeYoung admit that a back injury initially reported as a back strain
may lead to a disc herniation requiring a lumbar laminectomy.  Thus, the jury
could have concluded that Texas Mutual=s assertions were
merely a pretext to justify its refusal to pay for Morris=s surgery.

                   Medical
History Regarding Treatment After the 2000 Injury

Texas Mutual claims that nothing in its file reflected that
Morris was treated after the 2000 Injury and that Rodgers confirmed this by
speaking with Mitchell, who, according to Rodgers, said that Morris returned to
full duty without any problems.  Texas Mutual also claims that further
investigation of the incident did not reveal much more.  According to Texas
Mutual, A[a]lthough [Texas
Mutual] requested that Morris provide medical records, few of those records
were provided.@  

The record, however, contains conflicting evidence.  First,
Mitchell testified he could not remember speaking with Rodgers, and that he
would not have told her that Morris returned to full duty.  Second, Morris=s lawyers sent
medical records to Texas MutualCincluding the page of treatment notes from
Dr. WaldropCshowing a number of visits by Morris between 2001 and
2003.  Once he was shown the records, even Dr. DeYoung agreed that Morris
received 25 to 30 treatments between the time of the 2000 Injury and April of
2003, during the time frame Dr. DeYoung considered critical to his evaluation.








At trial, Texas Mutual admitted that it had in its
possession this key page of medical treatment notes and that it never gave the
notes to Dr. DeYoungCeven though Dr. Young had stated how
significant this material would be to his assessment of a connection between
the 2000 Injury and the 2003 surgery.  Though Texas Mutual said it overlooked
the page because it was wrongly coded, this was the only page of medical notes
that was wrongly coded; the remainder of the medical records made it to Dr.
DeYoung.  As a result of the coding error, Dr. Waldrop=s notes from 2001B2003 repeatedly
failed to make it to Dr. DeYoung.  A jury could have found it too coincidental
that, out of all the medical records, the only one wrongly coded was the
critical page showing a causal link between the 2000 Injury and the 2003
surgery. 

In a related argument, Texas Mutual contends that Morris
hampered its investigation by providing it with a release form signed by Morris=s wife rather than
by Morris.  Texas Mutual contends that a form signed by anyone other than
Morris would not have entitled Texas Mutual to obtain Morris=s records.  However,
Texas Mutual also had an authorization signed by Morris.  Before the second
benefit-review conference, at Texas Mutual=s request,  Morris
personally signed an authorization for Texas Mutual to obtain his records from
Dr. Waldrop.  In addition, Texas Mutual points to no evidence that Dr. Waldrop=s office refused
to provide medical records based on either authorization, and Morris testified
that Texas Mutual never told him it could not use the authorization form signed
by Morris=s wife.  Morris also testified that Texas Mutual never
asked for the records.  Therefore, whether the authorization signed by Morris=s wife would have
enabled Texas Mutual to obtain Morris=s medical records
is irrelevant, because the evidence does not show that Texas Mutual ever sought
to obtain any records with it and was refused, and the evidence affirmatively
shows that Morris himself gave Texas Mutual an authorization he had signed to
enable the company to obtain medical records from Dr. Waldrop=s files.








   The 1998 Injury as Possibly Precluding a Finding of AReasonably Clear
Liability@

We next consider two arguments Texas Mutual urges:  (1)
that liability never became reasonably clear because of the undisclosed 1998
back strain or sprain, and (2) that if Morris had disclosed  the 1998 injury
before the contested-case hearing, Dr. DeYoung would have concluded that Morris=s back surgery in
April 2003, was not related to the 2000 Injury, and the Commission likely would
have concluded that Morris was not entitled to benefits.

First, Texas Mutual does not dispute that Morris suffered a
compensable injury on June 12, 2000; its dispute is over the extent of the
injury, i.e., whether the 2000 Injury was a producing cause of the herniation
requiring surgery.  In effect, Texas Mutual suggests that its liability for
Morris=s surgery has
never become Areasonably clear@ because of Morris=s allegedly
undisclosed back strain or sprain in 1998.[28] 









Under the law governing workers= compensation
carriers, the term Ainjury@ includes the
aggravation of a pre-existing condition.  See Tex. Lab. Code Ann. ' 401.011(26)
(Vernon 2006); City of Pasadena v. Olvera, 95 S.W.3d 494, 497 (Tex. App.CHouston [1st
Dist.] 2002, no pet.).  To defeat coverage, a pre-existing condition or bodily
infirmity must be the sole cause of the present disability or incapacity.  See
Texas Employers= Ins. Ass=n v. Page, 553 S.W.2d 98,
100 (Tex. 1977); Transcontinental Ins. Co. v. Crump, 274 S.W.3d 86, 100
(Tex. App.CHouston [14th Dist.] 2008,  pet. filed).  As noted
above, Dr. DeYoung never opined that Morris=s back injury in
1998 was the sole cause of his herniation.  In addition, both a Texas Mutual
claims supervisor and Texas Mutual=s expert, Wayne
Davidson, acknowledged that Texas Mutual is obligated to pay for aggravation of
a pre-existing injury.  Thus, even presuming that any prior back strain Morris
may have suffered in 1998 was still affecting him in 2003, the jury reasonably
could have concluded that Morris=s compensable back
injury in 2000 aggravated a pre-existing condition and that the earlier injury
would not have provided a reasonable basis for denying Texas Mutual=s obligation to
pay for the required medical treatment.[29]


Second, we consider Texas Mutual=s claim that
Morris=s alleged
duplicity in not revealing the 1998 injury Astacked the deck
in his favor@ so that both Dr. DeYoung and the Commission held in
his favor when they otherwise would not have done so.  This argument prompts
four responses:

(1) The jury had before it all the evidence concerning Morris=s failure to tell Texas Mutual and
his doctors about the 1998 injury and Morris=s explanation for why he did not think to tell anyone about
it.  Morris explained that he did not fall off the truck, but caught himself as
he was about to fall, and that the act of stopping the fall injured him. 
Morris testified that he did not think to tell Dr. DeYoung about it because he
fully recovered.  The jury was asked if Morris committed fraud by not revealing
the injury and the jury said he did not commit fraud. 

(2) Dr. DeYoung testified via deposition and both parties had the
opportunity to ask him what impact the revelation of the 1998 injury had on his
diagnosis.  Neither party directly asked him the question.








(3) As to the Commission=s decision and whether it would stand if the Commission had
known the truth about the 1998 injury, to ask us to engage in Awhat ifs@ regarding the Commission=s decision at the contested hearing
is to ask us to speculate.  That we will not do.  

(4) Even if Dr. DeYoung and the
Commission had known about the 1998 injury, the jury heard testimony that Texas
Mutual could avoid liability only if the 1998 injury were the sole cause of the
herniated disc and resulting surgery.  No one testified that the 1998 injury
was the sole cause of the herniated disc, and Texas Mutual presented no
evidence that it reasonably believed this injury to be the sole cause of Morris=s disc herniation.

The Alleged New Injury in 2003 and the Claimant=s Inaccurate
Description of His 2000

                                   Injury as Possible Cause
for Reversal

Texas Mutual also contends that it reasonably disputed
coverage because it believed Morris=s surgery was a
result of a Anew and more severe injury in 2003,@ and not the 2000
Injury.  However, Texas Mutual never offered any evidence of a new injury, or
any evidence that another injury necessitated the surgery.  Dr. DeYoung
testified by deposition that lumbar laminectomies are performed for herniated
discs, not back strains, and, based on the medical records, Morris did not have
a herniated disc before March of 2003.  But on cross-examination in that
deposition, Dr. DeYoung also stated that a back strain could lead to a
herniated disc. In general, Dr. DeYoung was equivocal concerning the cause of
Morris=s herniation,
stating that it was Areally not clear@ from the records,
but nevertheless he would relate it to Asome activity
around the onset of his lower C of his severe lower back and leg pain and
numbness and tingling@ that developed shortly before the
surgery.  Dr. DeYoung, however, apparently did not take into account the
reference in Dr. Waldrop=s treatment notes to radiculopathy,
because Dr. DeYoung testified that Morris=s records did not
contain any description of radicular symptoms related to the 2000 Injury. 








Texas Mutual also points to Morris=s inaccurate
description of the events surrounding the 2000 Injury as one reason it believed
a different injury caused the need for surgery.  Although Morris described a
different incident to treating doctors in 2003 C slipping on or
falling from a fire truck C the date Morris consistently gave for the
incident (June 12, 2000) was the same as that of the undisputedly compensable
injury.   But, as previously noted, no one from Texas Mutual ever asked Morris
about the discrepancy.  The jury could have concluded that Morris was merely
confused about which incident happened in 2000 or unintentionally attributed
his pain in 2003 to slipping or falling off a fire truck instead of lifting a
patient out of a ditch on a backboard, or the jury may not have considered the
discrepancy significant enough to raise a question about coverage.  Likewise,
the jury may have viewed Texas Mutual=s failure to ask
about the discrepancy as one additional indication that Texas Mutual did not
reasonably investigate the claim.  

                                          Carrier=s Expert Testimony

Finally, citing the testimony of Dr. DeYoung and Wayne
Davidson, Texas Mutual=s workers= compensation
expert, Texas Mutual contends that the evidence Aonly shows a bona
fide dispute, not clear liability.@  However, the
mere fact that a carrier offers expert testimony to support its position at
trial does not insulate the carrier from liability.  See State Farm Lloyds
v. Nicolau, 951 S.W.2d 444, 448 (Tex. 1997).  Dr. DeYoung admitted that Texas
Mutual did not give him medical records about Morris=s treatment
between 2001 and 2003 C the very time frame that Dr. DeYoung had
told Texas Mutual was important to his evaluation C and the jury was
entitled to conclude that Dr. DeYoung=s initial opinions
were based on inadequate information.  See id. 








          Moreover,
although Dr. DeYoung ultimately concluded that Morris=s lumbar
herniation requiring surgery was not causally related to the 2000 Injury, the
jury was presented with other evidence it reasonably could have considered when
determining the weight to give Dr. DeYoung=s opinion.  First,
the jury could have determined that Dr. DeYoung=s opinion was
undermined by his testimony that the records relating to Morris=s injury did not
contain a description of radicular symptoms, when Dr. Waldrop=s treatment
records actually reflected that Morris suffered from an AL5/SI n. root disc
radiculopathy@ after the 2000 Injury, and this notation in the
records was a factor that the Commission considered in finding in Morris=s favor.  Second,
Dr. DeYoung=s testimony that a new and independent injury caused
Morris=s herniation was
at best speculative.  No new incident was ever identified, and Dr. DeYoung
admitted that it was Areally not clear in the medical records
what caused it,@ but he nevertheless opined that he would
relate Morris=s herniated disc to Asome activity@ occurring about
two days before March 28, 2003.  The jury also could have considered Dr.
DeYoung=s acknowledgment
that the mechanism of injury Morris originally reported in connection with the
2000 Injury, initially reported as a back strain, ultimately could lead to a
disc herniation.  Given the evidence before it, the jury was entitled to
discount Dr. DeYoung=s subsequent opinion that Morris=s lumbar
herniations were not causally related to the lumbar strain suffered in
connection with the  2000 Injury.[30] 
Likewise, the jury was entitled to reject Davidson=s testimony on the
ultimate issue of whether Texas Mutual violated the Texas Insurance Code and to
base its decision on other evidence.[31]


As Morris points out, other evidence in the record would
enable a reasonable jury to find no reasonable investigation by Texas Mutual
and reasonably clear liability for Texas Mutual on Morris=s claim.  








The Carrier=s Claim that the
Adjuster Would Not Have Learned Any Useful Information

                       Even if She Had Spoken with the
Claimant=s Surgeon

Texas Mutual also claims that the evidence does not support
liability for failure to conduct a reasonable investigation because Dr. Neblett
could not have given Rodgers information showing that Texas Mutual=s liability was
reasonably clear.  Texas Mutual explains that Dr. Neblett Anever examined or
treated Morris before April 2003, and there is no evidence that Dr. Neblett
could have offered any additional information to show a causal relationship
existed.@  We disagree.

First, Morris=s workers= compensation
expert, who was experienced in handling claims like Morris=s, testified that
Dr. Neblett was the best person for Rodgers to call.  He explained that Dr.
Neblett was the only doctor who had examined Morris to ascertain the exact
problem with his back.  Rodgers would have spoken with Dr. Neblett after the
surgery.  At that point, Dr. Neblett knew the state of Morris=s spine better
than anyone else, even Dr. Waldrop.  Having that information alone would have
been useful to the investigation.  In addition, even without this testimony, we
know that Dr. Neblett spoke with Morris and obtained some medical history,
because, for example, he listed the date of the 2000 Injury as the date of
initial injury in his letter to Texas Mutual. 

Second, even if Dr. Neblett could not have given Rodgers
any information, Morris had significant knowledge concerning the injury and the
medical care he received, and Rodgers never once spoke to him.  Had she done
so, Morris could have told her about the chiropractic visits, and he could have
explained the discrepancy in what was listed as the cause of the 2000 Injury.  

In short, on the day that Rodgers first picked up Morris=s file, she
decided to dispute liability before speaking with the two people who could have
enlightened  her the most C  Dr. Neblett and Morris.  We are not
persuaded by Texas Mutual=s argument.








In summary, on this issue as to whether the evidence
supports a finding of Ano reasonable investigation@ or Areasonably clear
liability,@ the jury had before it proof that

!       Medical and non-medical personnel at Texas
Mutual initially authorized the surgery; 

!       Texas Mutual=s adjuster (Rodgers) disputed coverage the same day
she first reviewed the file, ignored accepted methods of investigating a claim,
may or may not have spoken briefly with Morris=s former employer, never spoke with the two people
who would know the most about the initial injury and/or the current state of
Morris=s spine, and did not speak with any
other treating physician before deciding to dispute the claim;

!       Texas Mutual complained that it had trouble
getting Morris=s medical records, yet Morris=s attorneys faxed his records to
Texas Mutual on more than one occasion, Morris=s wife signed a release for Morris=s medical records as early as
mid-April, and Morris himself signed a release for his medical records;

!       Twice Texas Mutual sent medical records to
its medical expert (Dr. DeYoung) claiming that those were all the records when,
in fact, one key page detailing multiple visits to Dr. Waldrop was left out of
the file;

!       The page left out of the records sent to Dr.
DeYoung showed that Morris saw Dr. Waldrop between the 2000 Injury and the 2003
surgery;

!       Dr. DeYoung
informed Texas Mutual that he would give Morris the benefit of the doubt if
Morris=s records
supported ongoing trouble with his back and if he had no back trouble prior to
2000.  Texas Mutual either did not know its files well enough to know that it
had a page of treatment notes from Dr. Waldrop showing visits between 2001 and
2003, or it chose not to give the sheet to Dr. DeYoung.  Either way, the jury
reasonably could have concluded that Texas Mutual acted unreasonably.








Reasonable jurors could have concluded from this evidence
that Texas Mutual failed to reasonably investigate the claim and that, after
failing to attempt in good faith to settle the claim when its liability had
become reasonably clear, Texas Mutual intentionally undertook a pretextual
investigation designed to support its denial of the claim.  We hold that, under
the applicable standard of review, the evidence is legally sufficient to
support a finding that (1)  Texas Mutual refused to pay Morris=s claim without
conducting a reasonable investigation with respect to the claim; and (2) Texas
Mutual failed to attempt in good faith to effectuate a prompt, fair, and
equitable settlement of Morris=s claim when its liability had become
reasonably clear.  Even if the evidence were legally insufficient to support
only one of these two findings, Texas Mutual=s legal-sufficiency
challenge regarding the jury=s answer to Question 2 would fail based on
the legally sufficient evidence as to the other finding. Accordingly, we
overrule Texas Mutual=s first issue.

B.        Legal
Sufficiency of Evidence Supporting the Jury=s Finding that the Carrier Knowingly
Violated the Texas Insurance Code

In its second issue, Texas Mutual contends that no evidence
supports the finding that the company knowingly violated the Texas Insurance
Code because Aall of the competent evidence shows that Texas Mutual
and its representatives believed the claim was not valid because the evidence
available to Texas Mutual showed that the back strain Morris sustained in 2000
was unrelated to the herniated disc he was diagnosed with in 2003.@  According to
Texas Mutual, the only evidence Morris offered to show Texas Mutual acted
knowingly was the testimony of its liability expert, which was conclusory, not
competent, and thus no evidence. 

In Question 3, the trial court asked the jury whether Texas
Mutual knowingly engaged in the conduct described in Question 2, discussed
above.  Consistent with section 541.002, the trial court instructed the jury
that: 

AKnowingly@ means actual
awareness of the falsity, unfairness, or deception of the act or practice
described in Question 2.  Actual awareness may be inferred where objective
manifestations indicate that a person acted with actual awareness.








See Tex. Ins. Code Ann. ' 541.002(1)
(Vernon 2009) (defining Aknowingly@).  Based on the
jury=s affirmative
finding, it awarded Morris $50,000 in damages for mental anguish and $500,000
in additional damages, both of which are recoverable only if the Texas
Insurance Code violation was committed knowingly.  See Minn. Life Ins. Co.
v. Vasquez, 192 S.W.3d 774, 777 (Tex. 2006).  The trial court later reduced
the award of additional damages to $250,000.  

As the Supreme Court of Texas explained in Vasquez,
claimants are not entitled to extra-contractual damages because the insurer was
negligent; instead, these extra damages are reserved for cases in which an
insurer knew its actions were false, deceptive, or unfair.  Id. at 775. 
Claims for extra-contractual damages should not be a routine addition to every
breach-of-policy case.  Id.  For this reason, appellate courts are required
to conduct an exacting review of damages that punish rather than compensate.  Id.


The following facts, viewed as a whole, are sufficient to
support a finding by reasonable jurors that Texas Mutual was not merely
negligent, but that it knowingly failed to effectuate a prompt, fair, and
equitable settlement of a claim with respect to which its liability had become
reasonably clear, and refused to pay a claim without conducting a reasonable
investigation with respect to the claim.  The evidence supports a conclusion by
reasonable jurors that persons at Texas Mutual were actually aware of the
unfairness of their actions.








Rodgers was Texas Mutual=s adjuster on
Morris=s claim and the
one who filed the TWCC-21 disputing his claim.[32] 
Before she was assigned the claim, it had been handled by another adjuster and
was not in dispute.  Rogers was assigned the claim the day after Morris=s surgery, and the
first day she took any documented action, she filed the dispute.  As discussed
above, Rodgers admitted that she did not complete the three-point contact
before disputing the claim, because she did not contact either Dr. Neblett or
Morris.  Morris=s expert, Frank Weedon, testified that Dr.
Neblett, as the treating surgeon, was Ain the best
position@ to answer
questions regarding whether Morris=s surgery was
related to the 2000 Injury.  Yet, no one ever contacted Dr. Neblett about
Morris=s surgery.  

Rodgers also testified that she had no idea how much time
she spent investigating Morris=s claim, she did not know if she had all
the information she needed before she filed the dispute, and she did not
remember if she had any medical information relating to the claim when she
filed the TWCC-21 notice that the claim was disputed.  She also testified that
she had no idea how Morris was supposed to secure medical treatment for his
back after Texas Mutual disputed his claim.  

In addition, Rodgers filed the TWCC-21 after Texas Mutual
had preauthorized the surgery based on Dr. Neblett=s request, when
Texas Mutual=s position C after a doctor
and another Texas Mutual employee had examined the file C was that the
claim was not in dispute.  Weedon testified that Rodgers, as a licensed
insurance adjuster, Aknew the rule[s],@ and had a duty to
act reasonably, to fairly resolve the claim, and to investigate it.  Weedon
opined that Rodgers knew she was mishandling the claim, or, as he stated it, Arunning a red
light,@ when she denied
the claim without reasonably investigating after Texas Mutual had preauthorized
Morris=s surgery.  Weedon
further testified that Rodgers=s actions were false, deceptive, and
unfair.  He also testified that, once Texas Mutual preauthorized the procedure
as reasonable and necessary to treat the condition, and there was no dispute concerning
compensability or the extent of the injury, to later dispute the claim was an
unconscionable act and an unfair claims practice that was Athoroughly
prohibited.@  








Texas Mutual contends that Weedon=s testimony was
not competent evidence of a knowing violation because it was conclusory.  See
Coastal Transp. Co. v. Crown Cent. Petroleum Corp., 136 S.W.3d 227, 232
(Tex. 2004) (stating that conclusory or speculative opinion testimony is
incompetent evidence and cannot support a judgment).  However, Weedon explained
that the underlying basis for his opinion was his own experience in going
through the training to be a licensed insurance adjuster, a position he held
for eight years.  Further, Rodgers confirmed that she was a licensed adjuster
and that she knew the rules for conducting a reasonable investigation.  

In fact, no one at Texas Mutual ever spoke with Dr. Waldrop,
or Dr. King, or Dr. Neblett, the three medical providers who would be in a
position to testify about Morris=s pre-surgery
condition.  Texas Mutual personnel testified that they did not need to speak
with a doctor to dispute the claim.  Weedon=s testimony, when
coupled with Texas Mutual=s complete failure to speak with any of
Morris=s doctors, is some
evidence supporting the jury=s finding that Texas Mutual knowingly
violated the Texas Insurance Code. 

Additionally, as discussed in greater detail above, Texas
Mutual falsely represented to Dr. DeYoung that it had received no documentation
of Morris=s medical treatment from the date of the 2000 Injury
to February 19, 2003, when, in fact, it had received Dr. Waldrop=s treatment notes
from that time period.  Without medical records from the relevant time period,
Dr. DeYoung gave Morris Athe benefit of the doubt@ and conditionally
attributed Morris=s disc herniation to Athe lumbar strain
of June 2000.@  Thereafter, Texas Mutual represented that it was
forwarding medical records of Morris=s treatment with
Dr. Waldrop, but it failed to forward the page of Dr. Waldrop=s treatment notes
reflecting treatments between 2001 and 2003 C the specific time
frame that had been the subject of Dr. DeYoung=s inquiry. This
failure caused Dr. DeYoung to rely on incomplete information when he issued a
later opinion supporting Texas Mutual=s dispute of
Morris=s claim. 
Concerning Texas Mutual=s failure to provide Dr. Waldrop=s treatment notes,
Dr. DeYoung testified:

Q:      Would it, in your opinion, be fraud for an
insurance company to withhold an important piece of medical evidence from a
doctor providing an important evaluation?

A:      I mean, I B obviously if they
knowingly, you know, left something out, I would obviously consider that B consider that
wrong.








Dr.
DeYoung also acknowledged that the treatment notes Texas Mutual withheld from
him were from the time period he considered Athe most important
time period for making an accurate assessment of [Morris=s] medical
condition.@  Although a Texas Mutual employee testified that this
page of notes was incorrectly coded, another Texas Mutual employee admitted
that no other medical records were wrongly coded.   Members of the jury were
able to see these witnesses and decide for themselves whether they believed the
reason for the failure to provide the document. 

In addition, although Texas Mutual claims that it refused
to pay because it thought that a new or an older, different injury caused the
herniated disc, Morris=s expert, Weedon, stated that a licensed
adjuster would know that a new or older, different injury would displace the
2000 Injury as a producing cause of the injury only if the injury was the sole
cause of the herniated disc.  In fact, Weedon testified that the 2000 Injury still
would be a producing cause if it only aggravated an earlier injury by as little
as one percent.  In the period leading up to and including the contested-case
hearing before the Commission, Texas Mutual had no evidence of an earlier
injury.  

Weedon also testified that Texas Mutual=s delays in (i)
obtaining Morris=s full medical records (approximately
fourteen months), (ii) scheduling a physical examination by a doctor of its choice
(eight months), and (iii) scheduling the contested-case hearing were
unreasonable and that Texas Mutual employees would know these delays were
unreasonable and unfair, especially since Morris=s operation
already was concluded and medical costs already had been incurred when Texas
Mutual first disputed the claim. 








Finally, although Rodgers and others based Texas Mutual=s continuing denial
of the claim in part on Morris=s inaccurate description of the cause of
the 2000 Injury, no one at Texas Mutual ever asked Morris about the discrepancy
until after the conclusion of the contested-case hearing, during discovery in
this case.  In addition, personnel at Texas Mutual never acknowledged that
Morris consistently listed the date of injury as June 12, 2000.  The jury
certainly could have concluded that a person performing a reasonable
investigation would want to know more about the matter, but Texas Mutual never
inquired.  This also is some evidence of a knowing failure to reasonably
investigate and a knowing failure to settle a claim as to which Texas Mutual=s liability had
become reasonably clear.

Under the applicable standard of review, the record
contains legally sufficient evidence of objective manifestations indicating
that Texas Mutual acted with actual awareness of the falsity, unfairness, or
deception of the two unfair acts or practices discussed above.  Even if the
evidence were legally insufficient to support the jury=s finding as to
one of these two acts or practices, legally sufficient evidence as to the other
act or practice would be sufficient to overrule Texas Mutual=s
legal-sufficiency challenge regarding the jury=s answer to
Question 3.   Accordingly, we overrule Texas Mutual=s second issue.

C.        Legal
Sufficiency of Evidence Supporting the Award of Mental Anguish Damages 

In the judgment, the trial court awards Morris a total of
$125,000 in actual damages, which includes $50,000 for past mental anguish.  In
its fourth issue, Texas Mutual contends that the evidence supporting these
damages is legally insufficient.  Specifically, Texas Mutual contends that the
evidence presented to support the mental-anguish damages amounted to no more
than mere worry, anxiety, vexation, embarrassment, or anger, which is
insufficient to support a recovery of such damages.  Texas Mutual also points
to evidence that Morris never sought treatment for any mental or emotional
problems, and that he represented to doctors in 2005 and 2006 that he did not
suffer from any depression, anxiety, tension, memory loss, or difficulty
sleeping.  Further, Texas Mutual contends that the evidence Morris cited
regarding physical pain and discomfort he experienced in connection with his
back injury, including an infection he developed after surgery, cannot support
an award of damages because it is directly related to Morris=s underlying
physical injury.

1.         Claimant=s Burden to Recover Mental Anguish
Damages








Generally, to recover mental-anguish damages, the claimant
must introduce direct evidence of the nature, duration, and severity of the
mental anguish, thus establishing a substantial disruption in the claimant=s daily routine.  See
Universe Life Ins. Co. v. Giles, 950 S.W.2d 48, 54 (Tex. 1997); Parkway
Co. v. Woodruff, 901 S.W.2d 434, 444 (Tex. 1995).  Direct evidence may be
in the form of the claimant=s own testimony, that of a third party, or
that of an expert.  Parkway Co., 901 S.W.2d at 444.  In the absence of
direct evidence of the nature, duration, or severity of the mental anguish, we
determine whether the record reveals any evidence of a high degree of mental
pain and distress that is more than mere worry, anxiety, vexation,
embarrassment or anger to support any award of damages.  Id.  Mental
anguish includes the mental sensation of pain resulting from such painful
emotions as grief, severe disappointment, indignation, wounded pride, shame,
despair, and public humiliation.  Id.   Additionally, the record must
contain evidence that the amount found is fair and reasonable compensation.  Saenz
v. Fid. & Guar. Ins. Underwriters, 925 S.W.2d 607, 614 (Tex. 1996). 
Courts must Aclosely scrutinize@ awards of
mental-anguish damages.  Giles, 950 S.W.2d at 54.

2.       Facts Showing Mental Anguish

Morris testified that the day after his surgery he learned
that Texas Mutual was disputing his claim and would not pay any of his medical
bills.  He testified that he was extremely scared and worried because he knew
he could not pay the medical bills.  Only a few days later, he learned that he
had a potentially life-threatening staph infection at the incision site.  He
returned to the hospital but was told to Aget out@ because he had no
insurance coverage.  However, Dr. Neblett found another doctor to donate his
time and treat Morris.  To help him recover from the staph infection, the
hospital put Morris in a special room.  The entire time Morris was there his
constant worries were not only whether he would get better and whether he would
survive the infection, but also how he would pay for the room and the medicine
they were Apumping through him.@








Morris further testified that when the hospital discharged
him following the staph infection, because he had no insurance coverage, he
received no follow-up care.  Morris continued to be hooked up to an intravenous
apparatus; only once did a nurse come to check on him and show him how to hook
it up.  Asked how it felt to go through this ordeal, Morris testified, AIt makes you
sick.  Makes you sick to your stomach.@  He said he felt
as though the world was Acrashing down@ on him.

Then, to worsen matters, Morris began receiving past-due
notices from his medical providers, who complained that he had not paid his
medical bills.  Several providers threatened to turn his unpaid bills over to a
credit bureau.  Morris testified that his credit rating dropped, an event that
was significant to him because he was a newlywed and wanted to be Athe man of the
house,@ to make a living,
and to provide for his family.  Instead, he was faced with a stack of medical
bills he could not pay.  Morris always had enjoyed an excellent credit
reputation and was proud of this fact.  He said it was demeaning to go to a
hardware store and be turned down for credit for a $500 washing machine.  AIt=s pretty
embarrassing.  Anyone can go get a washing machine except me.@  In
addition, because his credit rating was poor, he also could not be listed on
the mortgage for his family home.  Only his wife was listed, which Morris
testified made him feel like Aa nothing.@

When asked at trial what he thought about Texas Mutual=s actions, he said
it A[f]eels like
somebody rips your heart out a lot of times and jumps up and down on it.@  Morris testified
that he wakes up in the middle of the night and thinks about Texas Mutual=s actions.  And,
as of the time of trial, he had not gotten over what Texas Mutual did.

Morris=s wife also testified about the emotional
toll Morris suffered as a result of Texas Mutual=s decision to
dispute coverage, to refuse to pay his medical bills, and to refuse to settle. 
She said Morris was Aa basket case@ when the hospital
told them he had no insurance coverage and he could not be treated there.  When
Morris learned that his medical bills would not be paid, it hurt his pride. 
But more than that, the long-term effect was that he felt Auseless,@ Aworthless,@ and Adegraded@ because he could
not take care of his new family.  She testified that, as of the time of trial,
Morris was Aa miserable human being.@ 








A close friend of Morris and his wife testified that since
Texas Mutual had disputed his claim, Morris had been Akeyed up, tense,
not happy.@  She said he is Anot the same
person.@  A[H]e used to be
more fun-loving and easygoing and happy all the time and always felt good.@  Now, A[h]e=s not happy@ and A[s]omething has
just totally broke[n] him down.@ 

The foregoing evidence is legally sufficient to support the
jury=s award for
mental-anguish damages.  This testimony is similar to the evidence presented in
Bentley v. Bunton, in which the Supreme Court of Texas found sufficient
evidence to support an award of mental-anguish damages.  94 S.W.3d 561, 575B76, 604 (Tex.
2002).  In Bentley, a district court judge sued a number of people
connected with a public-access television show hosted by Bunton.  Bunton
repeatedly accused Bentley of being corrupt, and, in fact, accused Bentley of
being the most corrupt public official in the area.  Bunton mentioned specific
proof he had of Bentley=s corruption, and on one occasion he
accused Bentley of acting criminally.  Id. at 568B71.  The Bentley
court explained:

The record leaves no doubt that
Bentley suffered mental anguish as a result of Bunton=s and Gates=s statements. 
Bentley testified that the ordeal had cost him time, deprived him of sleep,
caused him embarrassment in the community in which he had spent almost all of
his life, disrupted his family, and distressed his children at school.  The
experience, he said, was the worst of his life.  Friends testified that he had
been depressed, that his honor and integrity had been impugned, that his family
had suffered, too, adding to his own distress, and that he would never be the
same.  Much of Bentley=s anxiety was caused by Bunton=s relentlessness
in accusing him of corruption.

Id. at 606B07.  Like Bentley,
Morris presented some evidence that he suffered a high degree of mental anguish
that substantially intruded into his daily routine.[33]









Texas Mutual claims that we cannot consider any evidence of
vexation or worry caused by the staph infection, and specifically, that we
cannot consider Morris=s testimony that he lost thirty pounds
while being fed intravenously.  Texas Mutual, citing Aranda v. Insurance Co.
of North America, 748 S.W.2d at 214, further argues that any testimony that
Morris endured physical pain, suffered physical limitations because of his
back, and could have died from the post-operative infection is irrelevant to
mental-anguish damages, because these problems are directly related to his
workplace injury.  We need not reach this issue because we have considered none
of this testimony in assessing the sufficiency of the mental-anguish evidence. 
We have considered only testimony relating to the impact on Morris=s life of Texas
Mutual=s refusal to pay
the medical bills.  Thus, when we considered the staph infection, we considered
only Morris=s testimony that he was afraid it might not get
treated and his constant worry while on intravenous medication as to how he
would be able to pay for the medication.  Morris=s fear that he
might not recover from the infection is not factored into our conclusion. 

Texas Mutual also urges this court not to consider the
bills that providers sent because Morris knew that his healthcare providers
were not supposed to send him any bills.  Yet, he received them still.  And,
one or more providers stated they would refer the unpaid bills to credit
bureaus.  But more than this, the amount of the bills themselves contributed to
Morris=s fears and
worry.  At trial, he reviewed only some of the bills, which totaled $12,431. 
His great concern that he would not be able to pay the medical bills
contributed to his mental anguish.  








Finally, Texas Mutual points out that Morris did not seek
treatment for any mental or emotional problem, and that he represented to
doctors on health questionnaires that he had no mental or emotional problems. 
Texas Mutual has not cited and we have not found any case in which a court has held
that mental anguish is unproved if a claimant fails to show a complaint to or
treatment by a doctor for a mental or emotional problem.  More importantly,
this same sort of testimony was noticeably absent in Bentley, the case
in which the Supreme Court of Texas found the testimony sufficient to support
mental-anguish damages.  But, to respond directly to Texas Mutual=s claim, the
records in both Bentley and this case contain evidence of emotional and
mental toll that is apparent without supporting testimony by a doctor.  Among
other evidence in Bentley, the record contained testimony that Bentley
was Asad@ or Adowncast@ and would never
be the same as he used to be.  See Bentley, 94 S.W.3d at 576B77.  Similarly,
our record contains testimony that Morris was Aa miserable human
being,@ that he was Anot happy,@ that he felt Aworthless,@ and that A[s]omething has
just totally broke[n] him down.@  Thus, although in neither case did the
claimant seek the help of a doctor, in both cases the claimants paid an
emotional or mental price and their countenances revealed the price paid. 
Further, in a subsequent opinion, the Supreme Court of Texas held that the
evidence of mental anguish previously found to be legally sufficient supported
a mental-anguish award of $150,000.  See Bunton v. Bentley, 153 S.W.3d
50, 52B53 (Tex. 2004).

Under the applicable standard of review, we conclude that
the record contains legally sufficient evidence to support the award for
mental-anguish damages. Accordingly, we overrule Texas Mutual=s fourth issue.

D.        Insufficiency
of Evidence of Damages to Credit Reputation

The jury awarded Morris $75,000 for loss of credit reputation,
comprised of $25,000 for past damages and $50,000 for future damages.  In its
third issue, Texas Mutual contends that the evidence supporting these damages
is legally insufficient.  








Texas allows awards for damage to credit reputation.  In
St. Paul Surplus Lines Insurance Co. v. Dal-Worth Tank Co., the Supreme
Court of Texas explained, A[t]o prove that credit rating is harmed is
to prove nominal damages; not until a loan is actually denied or a higher
interest rate charged is there proof of actual damages.@  974 S.W.2d 51,
53 (Tex. 1998).  But even more importantly, the high court added this language
in explaining the precise proof necessary to show actual damage:  AThere must be a
showing that such inability resulted in injury and proof of the
amount of injury.@  Id. (emphasis added).  Thus, in Dal-Worth
Tank, the court held that no evidence of damage to credit reputation
existed because there was no evidence of a real injury and no evidence of any
specific increase in the claimant=s cost of doing
business.  Id.  For example, before its credit reputation was allegedly
damaged, Dal-Worth Tank had a large line of credit that was greatly diminished,
but Dal-Worth Tank introduced no evidence that the decline injured it in any
way because it did not need to use the line of credit.  Id.  Likewise,
in Castañeda, the plaintiff testified that she Ahad applied for
credit cards and was turned down.@  Castañeda,
988 S.W.2d at 199.  The Supreme Court of Texas concluded that this evidence was
legally insufficient,[34]
reiterating that Athere must be a showing that the inability
to obtain a loan resulted in injury and proof of the amount of that injury.=@  Id.
(quoting Dal-Worth Tank Co., 974 S.W.2d at 53).  

Loss to credit reputation is a form of economic, or
financial, damage.  For this reason, it makes sense to require more precision
in the proof of damage.  That, it seems, is the reasoning behind Dal-Worth
Tank Co. and Castañeda.  We understand both of those decisions to
instruct that a claimant cannot recover for damage to credit reputation unless
he shows that he suffered identifiable, measurable damages.  Castañeda,
988 S.W.2d at 199; Dal-Worth Tank Co., 974 S.W.2d at 54.  Testing Morris=s proof against
this standard, we cannot affirm the award.








Like the plaintiffs in Dal-Worth Tank Co. and
Castañeda, Morris failed to prove any amount of injury.  Morris
testified that he prided himself on having a sterling credit reputation.  After
Texas Mutual=s actions, his credit rating Adefinitely went
down@ and he was unable
to finance a new washing machine because of his poor credit rating.  He also
testified that he was unable to secure a mortgage on his home, which had to be
financed solely in his wife=s name.  At no point, however, did Morris,
or anyone else, such as an expert, define the injury Morris sustained when he
could not take out a loan on a washing machine.  In addition, neither Morris,
nor any witness in his behalf, put a dollar amount on the injury he claimed to
have sustained because of his inability to obtain the washing-machine loan or
to have his name on his home mortgage.  In short, Morris proved no
identifiable, measurable damages.  See Tex. Mut. Ins. Co. v. Ruttiger,
265 S.W.3d 651, 672B73 (Tex. App.CHouston [1st
Dist.] 2008,  pet. filed).  For these reasons, we hold that the evidence is
legally insufficient to support an award for damage to credit reputation.  

We sustain Texas Mutual=s third issue and
modify that portion of the judgment to omit the damages for credit reputation
and to award actual damages in the amount of $50,000, representing the jury=s award of
mental-anguish damages only.  

As a consequence of reducing the award of actual damages,
we also modify that portion of the judgment awarding additional damages
consistent with section 541.152, which permits the trier of fact, upon a
finding that the defendant acted knowingly, to award an amount not to exceed
three times the amount of actual damages.  See Tex. Ins. Code Ann. ' 541.152 (Vernon
2009).  Therefore, as discussed more fully below, we also modify that portion
of the judgment to award additional damages of $100,000, two times the actual
damages after reduction on appeal.

As a further consequence of these modifications, because we
are reducing the damages awarded, we also reverse the award of attorney=s fees and remand
for a new trial on that issue.[35] 
The reduction in the actual and additional damages awarded results in a total
award of $150,000, less than twenty-five percent of the jury=s total award. 
Therefore, we reverse that portion of the judgment awarding attorney=s fees and remand
that issue for a new trial.  








E.        Jury Instructions

In its fifth issue, Texas Mutual contends that the trial
court erred in instructing the jury in Question 2 on Aeight different
theories of liability.@  Texas Mutual asserts that, assuming the
record contains evidence to support one or more of these theories, there is not
legally sufficient evidence to support all the submitted theories.  Therefore,
according to Texas Mutual, the trial court erroneously submitted a jury
question containing both valid and invalid theories of liability in
contravention of Crown Life Insurance Co. v. Casteel, 22 S.W.3d at 388
(holding it was error to submit a broad-form liability question incorporating
both valid and invalid theories of liability).  Under Casteel, when the
jury charge is drafted such that the jury may have based its finding of
liability Asolely on one or more . . . erroneously submitted
theories . . . . it is impossible for us to conclude that the jury=s answer was not
based on one of the improperly submitted theories.@  Id. at
389.  AHowever, when
questions are submitted in a manner that allows the appellate court to
determine that the jury=s verdict was actually based on a valid
liability theory, the error may be harmless.@  Id.
(citing City of Brownsville v. Alvarado, 897 S.W.2d 750, 752 (Tex. 1995)
(ASubmission of an
improper jury question can be harmless error if the jury=s answers to other
questions render the improper question immaterial@) and Boatland
of Houston, Inc., v. Bailey, 609 S.W.2d 743, 749B50 (Tex. 1980)
(holding that the potentially improper submission of defensive issues was
harmless error when the jury also found for the defendant on independent
grounds)).  Thus, reversal is not required when an appellate court may be Areasonably certain
that the jury was not significantly influenced by issues erroneously submitted
to it.@  Romero v. KPH
Consolidation, Inc., 166 S.W.3d 212, 227B28 (Tex. 2005)
(quoting Braun v. Flynt, 731 F.2d 1205, 1206 (5th Cir.1984)).








On appeal, the parties dispute whether Question 2 included
two or eight theories of liability.  However, for the purposes of our review,
we need not decide this issue because, however it is viewed, we are reasonably
certain that the jury answered Ayes@ to one of two
specific sub-parts of Question 2, both of which are supported by legally
sufficient evidence.  For this reason, we need not look further. 

In the first question, the jury was asked to decide if
Texas Mutual breached its duty of good faith and fair dealing in one of two
ways:

(1) denying a claim when it knew or should have known that it was
reasonably clear that the claim was covered, or 

(2) failing to
reasonably investigate a covered claim.  

The
jury answered Ayes@ to this question, finding that Texas
Mutual violated one or both of these duties.

Next, Question 2 required the jury to decide if Texas
Mutual engaged in various unfair or deceptive acts or practices, which were
subdivided into unfair settlement practices and misrepresentations.  Two of the
acts or practices listed under unfair settlement practices are almost verbatim
the two acts the jury was asked to consider in Question 1.  Question 2 listed
the acts this way:

b.  failing to attempt in good faith to effectuate a prompt, fair, and
equitable settlement of a claim with respect to which the insurer=s liability has become clear; or

. . . 

d.  refusing to pay a claim without
conducting a reasonable investigation with respect to the claim.








It is
extremely unlikely that the jury, having just considered essentially these same
two items in Question 1, and having decided that Texas Mutual engaged in one or
both of them, would arrive at Question 2 and fail to recognize that sub-parts Ab@ and Ad@ listed above were
the same items listed in Question 1.  And, it is equally unlikely that the
jury, having answered one or both of these inquiries affirmatively in Question
1, would not give the same answer in Question 2.  Thus, if the jury found both Areasonably clear
liability@ and Ano reasonable investigation@ in response to
Question 1, we are reasonably certain that the jury made these same findings in
response to Question 2.  Likewise, if the jury found in responding to Question
1 that Texas Mutual engaged in only one of these two practices, we are
reasonably certain that the jury would make the same finding in responding to
Question 2.  In section III. A. above, we have found that legally sufficient
evidence supports both of these findings.  The same evidence supports a Ayes@ answer in both
Question 1 and Question 2.

The jury also may have found other unfair acts were
committed, but we need not consider whether any of the other six acts listed in
Question 2 were submitted erroneously or whether the jury found that any of the
other six acts were committed.  This exercise is unnecessary given the
determination that sufficient evidence supports findings as to both items
listed in Question 1 and that sufficient evidence supports findings as to the
same two items in Question 2.  And, we are reasonably certain that whatever
finding the jury made in response to Question 1, it made the same finding in
response to Question 2.  For this reason, we find no Casteel error
requiring reversal.  See Romero, 166 S.W.3d at 227B28; see also
Dillard v. Tex. Elec. Co-op., 157 S.W.3d 429, 434 (Tex. 2005) (explaining
that A[u]nder broad-form
submission rules, jurors need not agree on every detail of what occurred so
long as they agree on the legally relevant result@).  Accordingly,
we overrule Texas Mutual=s fifth issue.[36]

IV.  Analysis of Claimant=s Cross-Appeal








The jury awarded Morris, among other things, additional
damages of $500,000 because it found that Texas Mutual acted knowingly.  Morris
moved for the trial court to enter judgment on the jury=s verdict, but
asked the trial court to reduce the jury=s award of
additional damages to $375,000, to reflect an amount that was three times the
actual damages of $125,000 the jury awarded Morris.  Morris argued that section
541.152 authorizes the recovery of actual damages plus three times the
amount of actual damages, for a total of four times the amount of actual
damages.  Texas Mutual filed a motion to disregard the jury verdict and
for judgment notwithstanding the verdict (AJNOV@), arguing, among
other things, that quadrupling the actual damages is not authorized by the
statute and is contrary to judicial precedent.  The trial court agreed with
Texas Mutual and, in its judgment, awarded Morris $250,000 in additional
damages, a sum that is two times the amount of actual damages awarded.

In one issue, Morris contends that, when construed
according to the rules of grammar and common usage, the language of section
541.152(b) permits a plaintiff to recover statutory damages of three times the
amount of actual damages, in addition to actual damages, for a knowing
violation of the Texas Insurance Code.  Statutory construction is a question of
law, which we review de novo.  See State v. Shumake, 199 S.W.3d 279, 284
(Tex. 2006).

Section 541.152, entitled ADamages, Attorney=s Fees and Other
Relief,@ provides as
follows:

(a)     A plaintiff who prevails in an action under
this subchapter may obtain:

(1)     the amount of actual damages, plus court
costs and reasonable and necessary attorney's fees;

(2)     an order enjoining the act or failure to act
complained of; or

(3)     any other relief the court determines is
proper.

(b)     On a
finding by the trier of fact that the defendant knowingly committed the act
complained of, the trier of fact may award an amount not to exceed three times
the amount of actual damages. 

Tex. Ins. Code Ann.' 541.152(a)B(b) (Vernon
2009).  








Morris argues that, because subsection (b) is separate from
subsection (a), which provides for actual damages, costs and attorney=s fees, it evinces
the legislature=s intent to allow the recovery of
additional damages for a knowing violation in addition to actual damages. 
Morris also argues that the absence of disjunctive language between subsections
(a) and (b) indicates that Athe claimant may independently invoke the
remedies contained@ in these two subsections.  Morris
contends that given the structure of the current statute, it cannot be
analogized to prior versions contained in former Insurance Code article 21.21,
which have been construed, contrary to Morris=s proposed construction,
to limit a plaintiff=s recovery to three times the amount of
actual damages, rather than actual damages plus three times actual damages.[37]


In essence, Morris argues that this court should read the
words Ain addition@ into section
541.152 between subsections (a) and (b).  Construing the statute in this
fashion not only would run afoul of the plain meaning of the statutory language
but also would contravene the history of the damages provision.  

In the 1985 version of the Insurance Code, article 21.21,
section 16(b) provided as follows:

(b)     In a suit filed under this section, any
plaintiff who prevails may obtain:

(1)     the amount of actual damages plus court
costs and reasonable and necessary attorneys= fees.  If the trier of fact finds that the defendant
knowingly committed the acts complained of, the court shall award, in addition,
two times the amount of actual damages; or

(2)     an order enjoining such acts or failure to
act; or

(3)     any other
relief which the court deems proper.

Act of
Mar. 19, 1985, 69th Leg., R.S., ch. 22, ' 3, 1985 Tex. Gen.
Laws 395 (repealed).  In 1995, section 16(b) was amended to change the
reference to an additional two times actual damages to Anot more than
three times the amount of actual damages@: 








In a suit filed under this section,
any plaintiff who prevails may obtain . . . the amount of actual damages plus
court costs and reasonable and necessary attorneys= fees.  If the
trier of fact finds that the defendant knowingly committed the acts complained
of, the trier of fact may award not more than three times the amount of actual
damages . . . .

Act of
May 19, 1995, 74th Leg., R.S., ch. 414, ' 13, 1995 Tex.
Gen. Laws 2988, 3000 (repealed 2003) (formerly Tex. Ins. Code art. 21.21, ' 16(b)(1))
(emphasis added).  The current section 541.152, enacted in 2003, simply places
language substantively identical to the emphasized language in a separate
subsection (b).  We cannot say that by taking that action, the legislature
intended to significantly increase the upper limit of the relief available for
a knowing violation of the Insurance Code.  Indeed, the legislature made clear
that the 2003 amendments were intended merely to recodify the existing law
without substantive change.  See Act of May 22, 2003, 78th Leg., R.S.,
ch. 1274, ' 27, 2003 Tex. Gen. Laws 3611, 4139 (AThis Act is
intended as a recodification only, and no substantive change in law is intended
by this Act.@).  Further, if the legislature intended that the
remedy available in subsection (b) was Ain addition@ to that provided
in subsection (a), it could have used those words, as it did in the 1985
version, in which it expressly stated that two times actual damages were
available Ain addition@ to the actual
damages found when the trier of fact finds that the defendant acted knowingly. 
But, the legislature did not use those words; it merely separated the sentences
into different sections.  Thus, we do not construe the statute to provide that,
in addition to actual damages, three times the amount of actual damages may be
awarded for a knowing violation.  For the same reason, we do not view the
absence of the disjunctive Aor@ between the
sections as indicating that the legislature intended to increase the damages
available for a knowing violation.  Therefore, we reject Morris=s
statutory-construction argument grounded on the legislature=s placement of the
available remedies into separate sections.

Morris also argues that his construction of section 541.152
is consistent with the legislature=s modification of
the DTPA damages provision to provide that a claimant may recover economic
damages and, in addition, three times the amount of economic damages if the
defendant=s conduct was knowing.  Section 17.50(b)(1) of the
DTPA, on which Morris relies, provides as follows:








(b) In a suit filed under this section, each consumer who prevails may
obtain:

(1) the amount of
economic damages found by the trier of fact.  If the trier of fact finds that
the conduct of the defendant was committed knowingly, the consumer may also
recover damages for mental anguish, as found by the trier of fact, and the
trier of fact may award not more than three times the amount of economic
damages; or if the trier of fact finds the conduct was committed intentionally,
the consumer may recover damages for mental anguish, as found by the trier of
fact, and the trier of fact may award not more than three times the amount of
damages for mental anguish and economic damages . . . . 

Tex. Bus. & Com. Code Ann. ' 17.50(b)(1)
(Vernon 2002).  Morris argues that the Supreme Court of Texas has confirmed his
interpretation of this language in Tony Gullo Motors I, L.P. v. Chapa,
212 S.W.3d 299 (Tex. 2006), and therefore the same reasoning should apply to
the Texas Insurance Code.  Morris relies on the following statements from Chapa: 


!       AFor a DTPA violation, [the plaintiff] could recover
economic damages, mental anguish, and attorney=s fees, but not additional damages beyond $21,639
(three times her economic damages).@  Id. at 304 (emphasis added).

!       AFor acts committed intentionally, a consumer may recover
additional damages up to three times the amount of economic and mental anguish
damages combined . . . .@  Id. at 304 n.6.

!       AUnder either fraud
or the DTPA, Chapa is entitled to $7,213 in economic damages and $21,639, in
mental anguish. . . . At the trial level, the most Chapa could recover under
the DTPA would be additional damages of $21,639 (three times her economic
damages) plus attorney=s fees of something less than $20,000
(depending on the new verdict).  If the court of appeals= reassessment of
exemplary damages for fraud exceeds this amount, Chapa would obviously be
better off electing that recovery . . . .@  Id. at
314B15.








These
statements from Chapa, however, were not necessary to the decision in
the case; nor do they appear to have been made deliberately and for future
guidance in the conduct of litigation.  See id. at 304, 314B15.  Therefore, we
conclude that these statements are obiter dicta.  See Edwards v. Kaye, 9
S.W.3d 310, 314 (Tex. App.CHouston [14th Dist.] 1999, pet. denied). 
Additionally, the Chapa language Morris cites does not apply because in Chapa
the high court was discussing section 17.50(b)(1) of the DTPA, not section
541.152(b) of the Texas Insurance Code.  The DTPA provision is not analogous
because it provides for both economic and additional damages within a single
subsection, contrary to the separate subsections in the Texas Insurance Code
provision that are central to the argument Morris advances.  Had the
legislature intended the two provisions to be construed similarly, it could
have drafted these provisions similarly, but it did not.  Further, the language
is somewhat different, expressly providing that a consumer, in addition to
economic damages, Amay also recover damages for mental
anguish . . . and the trier of fact may award not more than three times the
amount of economic damages . . . .@  The inclusion of
the Amay also recover@ language, which
does not appear in section 541.152(b) of the Texas Insurance Code, indicates
that additional damages are authorized for a knowing violation of the DTPA, and
so appears more favorable to a plaintiff than the language in section
541.152(b).  Had similar language been included in section 541.152(b), or had
the statute contained the language Morris contends should be read into it C that the trier of
fact may award three times the amount of actual damages Ain addition@ to the award of
actual damages C our conclusion might be different. 

Finally, we note that Morris cites no case law to support
the notion that a plaintiff may obtain additional damages of three times the
amount of actual damages under section 541.142(b), and we have found none. 
Therefore, based on the plain language of the provision, statutory history, and
prior precedent, we decline to adopt Morris=s interpretation
of section 541.142(b).  

We overrule Morris=s sole issue in
his cross-appeal.

V.  Conclusion








Having considered the issues raised in Texas Mutual=s appeal and
Morris=s cross-appeal, as
well as Texas Mutual=s motion for rehearing, we conclude there
is no evidence to support that portion of the judgment awarding Morris damages
for loss of credit reputation in the past and in the future.  We therefore
modify the judgment to omit the damage awards for loss of credit reputation,
and instead to reflect an award of actual damages in the amount of $50,000.  We
further modify the judgment to reflect an award of additional damages in the
amount of $100,000.  We reverse that portion of the judgment awarding attorney=s fees and remand
for a new trial of that issue and also for recalculation of pre-judgment and
post-judgment interest.  We affirm the remainder of the trial court=s judgment.

 

 

/s/      Kem Thompson Frost

Justice

 

Panel
consists of Justices Anderson and Frost.*

 

 

 

 









[1]  See Crown Life Ins. Co. v. Casteel, 22 S.W.3d
378 (Tex. 2000).





[2]  The Commission is now known as the Texas Department
of Insurance, Division of Workers=
Compensation.  See Tex. Lab. Code
Ann.' 402.001(b) (Vernon 2006).  We refer to that authority
as it existed during the period relevant to this case.





[3]  Morris also sued Joy Rodgers, Texas Mutual=s adjuster on his claim, but she is not a party to
this appeal.





[4]  Unless otherwise specified, all statutory references
in this opinion are to the Texas Insurance Code.





[5]  See Tex.
Ins. Code Ann. ' 541.061(1) (Vernon 2009).





[6]  See id. '
541.061(2).





[7]  See id. '
541.061(3).





[8]  See id. '
541.061(5).





[9]  See id. '
541.060(a)(1) (Vernon 2009).





[10]  (Emphasis added). See id. ' 541.060(a)(2).





[11]  See id. '
541.060(a)(3).





[12]  (Emphasis added).  See id. ' 541.060(a)(7).





[13]  Relying on Provident American Insurance Company
v. Castañeda, Texas Mutual asserts that, generally, a finding that an
insurer failed to conduct a reasonable investigation is not a sufficient basis
for an insurer=s liability under section 541.060 because a finding
that the insurer=s liability had become reasonably clear is usually
necessary for an insurer to be liable for an Insurance Code violation.  See
988 S.W.2d 189, 197B98 (Tex. 1998); see also Tex. Ins. Code Ann. ' 541.060(a)(2)(A), 541.060(a)(7).  Texas Mutual states
that there is an exception to this general rule when the insurer=s failure to conduct a reasonable investigation causes
damages separate and apart from the damages that would have resulted from a
wrongful denial of the claim.  See Castañeda, 988 S.W.2d at 198B99.  Nonetheless, Texas Mutual asserts that the
Supreme Court of Texas abolished this exception in the workers= compensation context by its decision in American
Motorists Insurance Company v. Fodge.  See 63 S.W.3d 801, 804 (Tex.
2001). Consistent with this argument, on appeal Texas Mutual does not argue
that there is legally insufficient evidence that its alleged failure to conduct
a reasonable investigation caused damages separate and apart from the damages
that would have resulted from a wrongful denial of Morris=s claim.  See Castañeda, 988 S.W.2d at
198B99. 





[14]  The Areasonably
clear liability@ and Ano reasonable
investigation@ portions of Question 2 are highlighted in the
quotation from this question above.





[15]  See Tex. Ins. Code Ann. ' 541.060(a)(7) (providing that an insurer engages in an unfair
settlement practice by Arefusing to pay a claim without
conducting a reasonable investigation with respect to the claim@). 





[16]  The structure and language of Question 2 are
substantially similar to Pattern Jury Charge (APJC@) 102.18. See Comm. on Pattern Jury Charges,
State Bar of Tex., Texas Pattern Jury Charges: Business, Consumer,
Insurance, Employment 88 (2003 ed.). The unambiguous language of PJC 102.18
allows a recovery based only upon a finding of no reasonable investigation.  See
id. In addition, a comment to PJC 102.18 states that Aeach subpart used from PJC 102.18 must be followed by
the word or, because a finding of any one of the acts or practices
defined in the instructions would support recovery.@ See id. at 89; see also Comm. on
Pattern Jury Charges, State Bar of Tex., Texas Pattern Jury Charges:
Business, Consumer, Insurance, Employment 96B7 (2008 ed.). 





[17]  Morris asserts in his appellate brief that this
court should examine the sufficiency of the evidence in light of the charge
submitted to the jury.





[18]  Texas Mutual was then known as the Texas Workers= Compensation Insurance Fund.





[19]  After reviewing test results, Dr. Neblett determined
that Morris was experiencing a Alarge left disc
herniation at the L4-5 level@ and Achanges of concern at the L5-S1 level.@  The L4-5 area of his spine was the same area injured
in the June 12, 2000 incident.





[20]  This is also known as a AForm TWCC-21@
and is filed with the Commission.





[21]  On cross-examination, when Mitchell was asked
whether he told Rodgers he was at full duty without any medical problems, he
stated, AI guess I did. It says it right there.@  However, he then qualified his comment, testifying, AI can=t tell you that
I said it because I don=t think he was at full duty without any problems@ and Ahe was at full
duty as much as his capacity allowed.@ 





[22]  Morris=s
expert testified that radiculopathy indicates neurological involvement. 
Waldrop=s reference to radiculopathy factored into the
Commission=s decision that Morris was entitled to benefits.





[23]  We understand ADOI@ to be a reference to the date of Morris=s injury, June 12, 2000.





[24]  Morris=s
expert testified that a conscientious adjuster would have requested medical
records long before this point in time.





[25]  The benefit-review officer=s recommendation included the following notation:  A[w]ithout the entry of 11/21/01 from Dr. Waldrop=s office, noting that [Morris] had problems at L5-S1
with radiculopathy, a favorable recommendation would not have been made for the
claimant because of the gap in the medical records thereafter (10 months gap). 
However, the symptoms were noted before the gap in the medical records and
other incidents noted in Dr. King=s
records cannot be deemed at this point to have resulted in an intervening
injury to [Morris=s] lower back.@





[26]  In relevant part, the ABackground Information@ section of the
decision provided as follows:

 

The
Claimant=s testimony was credible, and it and the medical
evidence established that the herniations at levels L4-5 and L5-S1 of his
lumbosacral spine naturally resulted from his compensable June 12, 2000 injury. 
The medical evidence, while allegedly somewhat incomplete, does show that the
Claimant was complaining of neurological symptoms and radiculopathy prior to a
significant gap in his medical records.  The report of the Carrier=s doctor, Dr. Stephen DeYoung, also demonstrates that
it is likely, if the Claimant had no prior back problems/injuries, and if he
has had low back complaints since June 12, 2000, that his current herniations
are causally connected to the June 12, 2000 injury.  The Claimant=s testimony demonstrated that he had no back problems
before June 12, 2000 and he has had difficulty with his low back since June 12,
2000.  He met his burden of proof on the issue.





[27]  In fact, Texas Mutual did not know about the 1998
injury until the parties were preparing for the trial in this case, so this was
not a reason for its earlier denial.





[28]  Texas Mutual also asserts that, by submitting a jury question on fraud,
the trial court effectively found that Texas Mutual Aproved a prima facie case of fraud.@  See Tex. R. Civ. P. 278 (AThe court shall submit the
questions . . . which are raised by the written pleadings and the evidence.@).  Consequently, Texas Mutual
urges, the evidence cannot simultaneously support Texas Mutual=s claim that Morris committed fraud
and Morris=s claim that Texas Mutual had no
reasonable basis to deny or delay paying the claim.  But, the mere fact that a
trial judge submitted a fraud question to the jury does not prove that there
must have been some evidence of fraud; indeed, the jury found that Morris did
not commit fraud, and Texas Mutual has not challenged this finding.  At trial, Morris testified that he did not previously
reveal the 1998 back strain because he recovered from it and so did not
consider it an Ainjury.@ 
Similarly, Bill Mitchell testified that initially he did not even remember
Morris being injured in 1998, and he explained that, in his view, a back strain
is A[j]ust something that happens@ and A[y]ou get over
it and go on.@  Morris was extensively cross-examined concerning his
credibility, and the jury was free to accept his explanation and find against
Texas Mutual on its fraud claim.  Accordingly, no circumstance of inconsistent,
simultaneous proof of fraud and bad faith exists.  





[29]  Texas Mutual protests on rehearing that this court
is improperly imposing a burden on Texas Mutual to prove that Morris=s back injury in 1998 was the sole cause of his
herniation.  This court has not imposed any such burden on Texas Mutual. 
Rather we have inquired into whether there is legally sufficient evidence to
support the jury=s finding of Areasonably
clear liability.@





[30]  See Uniroyal
Goodrich Tire Co. v. Martinez, 977 S.W.2d 328, 338 (Tex. 1998)
(uncontroverted expert testimony may be regarded as conclusive only if the
nature of the subject matter requires the factfinder to be guided solely by the
opinion of experts and the evidence is otherwise credible and free from
contradictions and inconsistency); Gregory v. Tex. Emp. Ins. Ass=n, 530 S.W.2d 105, 107 (Tex. 1975) (opinion testimony
is generally held not to be binding on the factfinder if more than one possible
conclusion can be drawn from the facts); Am. Interstate Ins. Co. v. Hinson,
172 S.W.3d 108, 119B20 (Tex. App.CBeaumont 2005, pet. denied)
(concluding that jury reasonably could reject insurer=s expert=s testimony that worker was
intoxicated due to marijuana use at time of his injury even though no other
expert testified, when worker testified he was not impaired at the time and
circumstantial evidence supported jury=s finding in worker=s favor). 





[31]  See Nicolau,
951 S.W.2d at 450 (noting that the jury, and not a reviewing court, has the
responsibility of deciding whether a carrier acted in bad faith).





[32]  See supra,  p. 11 & n.20.





[33]  See id.; see also Colonial County Mut.
Ins. Co. v. Valdez, 30 S.W.3d 514, 526 (Tex. App.CCorpus Christi 2000, no pet.) (holding that evidence
was sufficient to support $20,000 mental-anguish award where plaintiff felt
deceived, Avery mad,@
and powerless, and suffered high blood pressure and sleeping disorders); Tex.
Animal Health Comm=n v. Garza,
27 S.W.3d 54, 62B63 (Tex. App.CSan
Antonio 2000, pet. denied) (holding that evidence of mental anguish was
sufficient where plaintiff Ahad changed,@ was Airritable,
depressed, and under tremendous stress,@
had physical symptoms, and felt like Aless
of a man@ because he was not providing for his family); Tex.
Farmers Ins. Co. v. Cameron, 24 S.W.3d 386, 395 (Tex. App.CDallas 2000, pet. denied) (holding evidence of mental
anguish sufficient where plaintiff Afelt
devastated,@ could not sleep, and Areduced dramatically her participation in church activities@). 





[34]  The opinion is unclear whether the court meant that
denial of a credit-card application does not qualify as a denial of a loan or
whether Castañeda failed to prove exactly how she was injured by being turned
down for credit cards. Id.  However, the important point is that a
plaintiff must have identifiable, measurable damages that are shown to the
jury.  Id. 





[35]  See Barker v. Eckman, 213 S.W.3d 306,
313B15 (Tex. 2006) (holding that, when appellate court
reduces damages award, attorney=s fee award
should be reversed and case remanded for new trial on that issue unless the
appellate court is reasonably certain that jury was not significantly
influenced by the erroneous amount of damages it considered); rePipe, Inc.
v. Turpin, 275 S.W.3d 39, 51 (Tex. App.CHouston
[14th Dist.] 2008,  no pet.) (reversing award of trial and appellate attorney=s fees and remanding case for new trial when court
could not be reasonably certain that jury was not significantly influenced by
erroneous damage amounts it considered). 





[36]  Texas Mutual predicates its sixth issue on this
court reviewing whether the trial court=s
judgment may be affirmed based on Texas Mutual=s liability under the common-law bad-faith claim, rather than the claim
under the Texas Insurance Code.  This court affirms Texas Mutual=s liability under Morris=s Insurance Code claim and does not review whether the trial court=s judgment may be affirmed based on Texas Mutual=s liability under Morris=s common-law bad-faith claim.  Accordingly, we need not and do not
address Texas Mutual=s sixth issue.





[37]  See Allstate Indem. Co. v. Hyman, No. 06-05-00064-CV, 2006 WL 694014, at *10B12 (Tex. App.CTexarkana Mar. 21, 2006) (mem. op.)
(holding that former article 21.21 limits a plaintiff=s total recovery to three times
actual damages), judm=t vacated by agr., 2006 WL 1229089 (Tex. App.CTexarkana May 9, 2006); Liberty Mut. Fire Ins.
Co. v. McDonough, 734 S.W.2d 66, 71 (Tex. App.CEl Paso 1987, no writ) (holding
that treble damages are calculated by making the total award three times the
actual damages found by the jury).





*  Retired Justice Wanda McKee Fowler left the bench
after the original opinion issued and did not participate on rehearing.